## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

**THOMAS MITCHELL**                                                          **PLAINTIFF**

**v.**                                              **CIVIL ACTION NO. 3:04CV-P563-C**

**LARRY CHANDLER** *et al.*                                              **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

_____Unrepresented by counsel, the plaintiff, Thomas Mitchell, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 alleging a retaliatory transfer by three Kentucky State Reformatory ("KSR") officials – Warden Larry Chandler, Unit Director Aaron Smith, and Classification Officer Terry Bell. The plaintiff specifically alleges that the defendants violated the First Amendment when they transferred him from his medically prescribed, single, wet[1] cell at KSR in retaliation for his filing lawsuits for himself and other inmates at KSR. On initial review of the complaint pursuant to 28 U.S.C. § 1915A, the court allowed the retaliation claim to proceed against the three defendants in their individual capacities for damages and in their official capacities for equitable relief.

        Discovery has been conducted, and this matter is presently before the court on defendants' motion for summary judgment, which has been fully briefed by the parties. Having reviewed the filings[2] and considered the relevant law, the court

---

[1]A wet cell is apparently one with a sink and commode.

[2]The court previously granted defendants' motion for *in camera* review of a sealed memorandum from Captain Kenneth Martin to Warden Chandler containing Captain Martin's findings from the investigation of the January 7, 2004, stabbing incident. The defendants claim that Chandler relied upon the information contained in the memorandum as a partial basis for his decision to transfer the plaintiff.

finds that there are genuine issues of material fact and that defendants are not entitled to judgment as a matter of law.  The defendants' motion for summary judgment will therefore be denied.

## I.  FACTS[3]

While the defendants' alleged involvement in the retaliatory transfer did not take place until late November 2003, it is necessary to provide details leading up to that time.  In his verified complaint, the plaintiff reports that while he was incarcerated at the Green River Correctional Complex ("GRCC") in November 2001, his bladder stopped functioning, and he was medically ordered to use a catheter (DN 1, Compl., Attach. #4).  The plaintiff notes that he is positive for the hepatitis-C virus and that the GRCC medical department was concerned that his disease could be transferred to others by unsanitary and unsterile catheterization methods (DN 1, Compl.).  The GRCC medical department requested a medical transfer for the following reason:  "Inmate unable to urinate . . . Inmate is straight cathing self every 4 - 6 hrs in the medical department."  (DN 1, Attach. #5).  Dr. Kimbler, former Medical Director of the Kentucky Department of Corrections ("KDOC"), approved the transfer to KSR (DN 1, Attach. #5).   On November 27, 2001, the

---

The court has reviewed the sealed document and finds the information contained therein merely cumulative of information already contained in the record.  Because the court has not relied upon this evidence in its consideration of the motion for summary judgment, the sealed memorandum need not be served on the plaintiff.

[3]The facts are taken from the plaintiff's verified complaint and its attachments, his pretrial memorandum, affidavits in the record, and the defendants' memorandum for summary judgment and its attachments.  The court will identify any disputed facts.

plaintiff was transferred to KSR's hospital, where he remained until December 6, 2001, when Dr. Khayat discharged the plaintiff to a single room with a door due to his "need[] to cath himself frequently." (DN 1, Attach. #7). Because KSR staff repeatedly transferred the plaintiff from a wet cell to a dry cell, Dr. Jackson, a urologist, wrote a July 7, 2002, prescription directing that the plaintiff be placed in a wet cell with a commode (DN 1, Compl., Attach. 13). The plaintiff advises that other than the maximum security facility at the Kentucky State Penitentiary, KSR's Dorm 7 is the only single, wet-cell environment available in the KDOC (DN 1, Compl.).

In October 2002, the plaintiff was asked by "numerous mentally ill inmates at KSR to aide them in filing grievances and law-suits to stop the double bunking because the mentally ill were being mistreated." (DN 1, Compl.). He decided to provide his legal-aide services to the mentally ill even though he knew "he would be facing the KSR and DOC officials' wrath." *Id.* To this end, he filed two § 1983 actions in this court and a civil rights action in state court.

In October 2002, the plaintiff filed the first federal action, Civil Action No. 3:02CV-P634-S, wherein he claimed that "DOC officials had allowed prison conditions at KSR to fall below the bottom line of human existance forbidden by the Eight Amendment."[4] After filing the action, the plaintiff began to receive warnings from inmates and staff "to watch his back, that KSR officials were

---

[4]That action was dismissed on initial review for failure to exhaust available administrative remedies prior to filing suit in federal court. *See* Civil Action No. 3:02CV-P634-S, DN 56.

extremely irate and were going to stop these legal attacks."  (DN 1, Compl.).  He alleged that he received a "'bogus' write-up" and that Deputy Warden Mugavin discharged him from his assigned legal position and threatened him.  *Id.*

In a letter to Mugavin dated May 24, 2003, the plaintiff wrote that a caseworker had told him that Mugavin "wanted me put on Reclassification 'early' and to recommend that I be tran[s]ferred from KSR (DN 33, Ex. 5, Attach. 14).  In Mugavin's response, he acknowledged that the plaintiff was classified early, but he denied the accusation that he had initiated the classification and added that the committee ultimately recommended that the plaintiff remain at KSR due to his medical needs (DN 33, Ex. 5, Attach. 16).

In an effort to stop the alleged retaliation, the plaintiff filed a second federal § 1983 action in this court, Civil Action No. 3:03CV-P469-R, in July 2003, alleging among other claims that he was retaliated against by KSR staff for representing "Special Inmates" that he defined as "inmates who are mentally and physically ill, illiterate, disabled, handicapped and the chronically ill."  (DN 1, Compl., Attach. 15).[5]  He also filed a state civil action, #03-CI-00650, in Oldham Circuit Court, "against the DOC and KSR officials claiming himself and the mentally ill inmates at KSR were being denied access to the courts, adequate medical needs, adequate safety and adequate winter clothing."  (DN 1, Compl.).

By affidavit, the plaintiff avers that on November 7, 2003, Mugavin

---

[5]This civil action has been dismissed on the defendants' motion for summary judgment.  *See* Civil Action No. 3:03CV-P469-R, DN 56.

approached him, and in a "very loud and threatening voice," stated, "I just wrote you a scathing letter, you had better pay attention to it, I am not going to put up with you "lying' on me."  (DN 1, Attach. #21, Plaintiff's Aff.).  Mugavin threatened that if the plaintiff filed "another piece of paper with his name on it telling 'lies,' he would use all his power as a warden to stop [the plaintiff] and keep [him] from doing it again."  *Id.*  Mugavin also kept screaming that the plaintiff would stop filing legal papers.[6]  *Id.*  In the so-called "scathing letter" referenced above, Mugavin advised that he had neither retaliated against the plaintiff nor attempted to prevent the plaintiff from assisting other inmates and that the plaintiff lost his position as a legal aide due to the plaintiff's misuse of that position and the receipt of funds apparently involved in legal proceedings (DN 33, Ex. 5, Attach. 24).  Mugavin closed by writing, "Please be advised that I do not take your accusations lightly and do not plan on having further accusations of a false nature presented without action on my part."  *Id.*

On November 7, 2003, the plaintiff wrote a letter to KDOC counsel John Damron advising that Mugavin had violated inmates' rights to access courts; had harassed, intimidated, and threatened the plaintiff; and had given him two letters and three verbal warnings to the effect that if the plaintiff did not stop filing legal papers, he would stop the plaintiff himself (DN 1, Attach. #22).  The plaintiff noted

---

[6]The plaintiff submitted an affidavit of Inmate LuSean Brown, who attested that he overheard the November 7, 2003, incident between the plaintiff and Mugavin.  Inmate Brown averred that he "heard Mugavin state that he would transfer Mitchell from KSR if that is what it took and if it took more action than that, that he would do what ever it takes to stop Mitchell from his civil actions." (DN 37, Ex. 3).

that he was sending a copy of the letter to Commissioner Taylor and Warden Seabold. *Id.* On November 9, 2003, the plaintiff sent a letter to Warden Seabold advising him of Mugavin's threatening and intimidating tactics and asking that he take steps to ensure that no KSR employee intimidated or threatened the plaintiff or any other inmate for seeking redress from the courts (DN 1, Attach. #23).

On November 18, 2003, the plaintiff filed a supplement to a "TRO motion" in Oldham Circuit Court actions 03-CI-0567 and 03-CI-650 alleging that Mugavin's threats and intimidation tactics were becoming more frequent and reporting that Mugavin said he was the warden and would stop the plaintiff from filing any more legal papers with his name (DN 1, Attach. #24). The plaintiff also alleged that his life and welfare were in danger as were the lives and welfare of the inmates that he was assisting. *Id.*

In late November 2003 or early December 2003, when defendant Chandler became the new warden of KSR, the plaintiff sent him a letter "informing him of the legal problems he was having concerning retaliation, threats and intimidating tactics being used at KSR by staff to stop his First Amendment rights." (DN 1, Compl.). By memorandum dated December 3, 2003, Warden Chandler reported that he had reviewed the plaintiff's letter, file and complaint and had reviewed Judge Rosenblum's order dated November 3, 2003 (DN 1, Compl. Attach. #27). Chandler concluded that the plaintiff's allegations regarding Deputy Warden Mugavin were "without merit." *Id.*

6

Shortly thereafter on December 11, 2003, defendant Smith told the plaintiff that Warden Chandler had given Smith instructions to place the plaintiff "on a 'Special' reclass and transfer [him] away from KSR's Medical Facility."[7] (DN 1, Compl.). According to Smith, "Warden Chandler had stated he was not going to allow Mitchell to stay at KSR while he was the warden. To get rid of Mitchell." *Id.* On that same day, the plaintiff wrote a letter to Warden Chandler and stated, "I was called to see United Director Smith and was informed that you advised him to transfer me to GRCC." (DN 1, Attach. #28). The plaintiff then explained to the warden that he had been transferred from GRCC two years earlier because of his need to catheter himself. *Id.* He claimed that the only reason that Warden Chandler or anyone else would want to transfer him is his legal activities against Mugavin, and he asked the warden to reconsider his transfer instructions. *Id.* The plaintiff also reported that Mugavin had repeatedly called the plaintiff's girlfriend a liar and that Mugavin had sent his girlfriend a threatening note,[8] which the plaintiff intended to ask the authorities to investigate. *Id.* The plaintiff submitted a November 25, 2003, letter from the Oldham County Attorney advising that he had forwarded the information that the plaintiff had sent him to the Kentucky State

---

[7] By affidavit, Warden Chandler avers, "I directed that transfer consideration be given on Inmate Mitchell at his *regularly scheduled classification* hearing in December 2003. The Classification Committee, consisting of [defendants Smith and Bell], recommended his transfer to [GRCC]." (DN 33, Ex. 2) (emphasis added). It is unclear whether the transfer was recommended on a regularly scheduled classification hearing or on a special-reclass basis.

[8] In its entirety, the note reads, "Judith stop this crusade against Mugavin or you will suffer the consequences with Thomas." (DN 33, Ex. 2, Attach. 4). The plaintiff and his girlfriend contend that this letter originated from Mugavin.

7

Police, who would investigate the matter (DN 1, Attach. #26).  The outcome of this investigation is unknown.

On December 16, 2003, the plaintiff went before the special-reclass committee consisting of defendants Smith and Bell,[9] both of whom recommended his transfer from KSR to GRCC (DN 1, Compl.).  In the plaintiff's verified complaint, he reports that on the record, the committee advised that the transfer was because the plaintiff was not in any programs at KSR.  *Id.*  Off the record, when the plaintiff asked defendants Smith and Bell why they were recommending a transfer when they were both aware of his medical needs, Smith allegedly stated that the decision "was based upon the instructions" but agreed that the transfer was wrong and that the plaintiff should not be transferred away from KSR's medical facility.[10]  *Id.*

On the "Transfer Authorization Form" filled out by defendants Smith and Bell on December 29, 2003, as a reason for the transfer, they marked that this placement would afford access to available bedspace (DN 1, Attach. #29).  They additionally commented that the transfer to GRCC was recommended "due to Inmate Mitchell not being in any programs offered at KSR."  *Id.*  They additionally

---

[9]On March 6, 2002, defendant Bell conducted a "Special Reclass Review" on the plaintiff and recommended his transfer to Luther Luckett Correctional Complex (DN 1, Attach. #8).  The plaintiff appealed this decision, advising, "I have a serious medical problem – my bladder no longer func[ti]ons – I must straight cather myself 6 - 7 times a day."  (DN 1, Attach. #9).  Mugavin addressed the appeal and responded that "according to the medical dept. you can have your medical needs handled at LLCC – presently I will advise unit staff to maintain you at K.S.R. in light of your circumstances."  *Id.*

[10]In a response to a Request for Admissions, Smith denied having admitted that the plaintiff should not be transferred to GRCC due to his medical needs (DN 37, Ex. 4).

8

marked "Yes" to conflicts.[11]  *Id.*  The plaintiff appealed the decision of the classification committee (DN 1, Attach. #2).[12]  Prior to addressing the appeal, Mugavin approved the transfer on December 30, 2003 (DN 1, Attach. #29).  On January 5, 2004, a Classification Branch Manager[13] approved the transfer.  *Id.*

On January 5, 2004, Mugavin responded to the appeal (DN 1, Attach. #2). Mugavin advised that the plaintiff's transfer had been forwarded to Central Office for review and that a separate medical determination would be made prior to his transfer.  *Id.*  He noted that the plaintiff's regular classification review was conducted in December and that the transfer was approved "based upon present overall profile."  *Id.*

On January 7, 2004, the plaintiff was stabbed (DN 33, Ex. 2, Attach. 7).  He claimed that the perpetrator was an inmate with a ski mask and alleged that Mugavin was behind the attack (DN 33, Ex. 2, Attach. 9).  Prison authorities believed that the plaintiff had stabbed himself (DN 33, Ex. 2).  The plaintiff was

---

[11]It is unknown what "Conflicts" means on the Transfer Authorization Form.  It could be an indirect reference to the conflict that the plaintiff was having with Mugavin.  However, on the November 2001 Transfer Authorization Form, where the plaintiff was initially transferred from GRCC to KSR for medical reasons, the "conflict" space is checked as well.

[12]In the appeal, the plaintiff explains that he has to wash and rinse the catheter after every use. When he is in a double cell or open wing, inmates see him wash his bloody catheter in the same sink or basin that they use to wash their coffee cups, shave, and brush their teeth. "It becomes very tense when they see this.  Most inmates know that I have hepatit[i]s C.  Placing me in a double celled room or open wing places myself and other inmates to unnecessary risks."  He additionally notes that privacy is necessary when using catheters, "otherwise i[t] would be too degrading to urinate."  (DN 1, Attach. 2).

[13]Chandler states that the Classification Branch Manager was LaDonna Thompson, but the signature on the Transfer Authorization Form is illegible.

9

taken to the University of Louisville Hospital for treatment, and upon his return on January 9, 2004, he was placed on a "15 minute watch, per Doctor Phil Johnson, for the safety and security of the institution." (DN 33, Ex. 2, Attach. 8). On two occasions in January and February 2004, the plaintiff initially agreed to take a lie-detector test to determined the veracity of his allegations, but before each test, he refused[14] (DN 33, Ex. 2, Attach. 9). Following an internal investigation, Internal Affairs officers concluded that the wounds were self-inflicted (DN 33, Ex. 7).[15]

On January 22, 2004, LPN Haffner filled out a Medical Assessment for Transfer form (DN 1, Attach. #30). Nurse Haffner marked that the plaintiff was in "Fair Health" and that he was "Qualified for Transfer." *Id.* No further explanation was offered.

On the following day, January 23, 2004, the plaintiff was transferred back to GRCC,[16] where he was placed in a two-man cell; forced to catheter himself in front of other inmates; and forced to walk about one-quarter of a mile daily to the

---

[14]Although he refused those two tests, the plaintiff reports that he was given two separate lie-detector tests in late November and early December 2004 that revealed he was not lying about the stabbing incidents (DN 37, Aff.). The defendants do not contradict this averment.

[15]The plaintiff submitted a mental health evaluation report completed by a licensed clinical psychologist in February 2004 (DN 37, Ex. #7). The report notes that the plaintiff alleged he was stabbed by two black men at GRCC and that he was also stabbed while at KSR. The psychologist concluded, "A review of his chart and previous contacts do not support these wounds as being self-inflicted. The nature of the wounds etc does not suggest self-infliction." It is ambiguous whether the psychologist's opinion pertains to the GRCC incident, the KSR incident, or both.

[16]In an affidavit, the plaintiff reports that in late 2003, a piece of catheter broke and went into his bladder. He was seen by a specialist, who scheduled surgery for removal of the catheter. The day prior to the scheduled surgery, the plaintiff was transferred away from KSR to GRCC and was unable to have the surgery (DN 37, Ex. 12).

medical unit with a red bag used for disposal of infected materials (DN 27, Plaintiff's Aff.).  The plaintiff avers that he was threatened numerous times to "get off the yard and go back to KSR"; that he received a death threat; and that he was stabbed by two inmates "telling me to get my infected ass back to KSR where I belong."  *Id.*

To "ensure the safe and secure operation of the institution," GRCC authorities transferred the plaintiff to Western Kentucky Correctional Complex ("WKCC") on May 3, 2004.  *Id.*  At WKCC, the plaintiff was placed in an open-wing dorm with a communal bathroom used by about 100 inmates (DN 37, Ex. #2, Attach. 3), in front of whom the plaintiff was thus required to catheter himself. (DN 27, Plaintiff's Aff.).  After the plaintiff received several threats, it was decided that each time the plaintiff had to urinate, he would "go to the security station, have security call up front, have security escort [him] to the hospital, allow [him] to urinate, and then wait to be escorted back to [his] dorm."  *Id.*  On October 15, 2005, WKCC authorities transferred the plaintiff back to KSR "based on a cell environment being more suitable for inmate Mitchell due to his physical condition." (DN 37, Ex. #2, Attach. 5).  The plaintiff was stabbed while at KSR, and "due to [his] no longer being in need of the specialized services offered at KSR," he was transferred to Kentucky State Penitentiary ("KSP") on February 8, 2005.  *Id.*  He claims that at KSP, where he is currently housed, "Inmates constantly walk in front of my open cell and see me using the catheter and have heard the many rumors

11

that I have an infectious disease that is life-threatening and do not want me around them." *Id.*

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof. *Id.* at 325.

Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id*. at 322. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. "[S]tatements in a verified complaint may function as the equivalent of affidavit statements for

purposes of summary judgment." *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000) (citing *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact.")).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  The moving party, therefore, is "'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.*  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-24.  If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

Retaliation for the exercise of a constitutional right is itself a violation of the Constitution

actionable under § 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  "In a retaliation claim . . . the harm suffered is the adverse consequences which flow from the inmate's constitutionally protected action. Instead of being *denied* access to the courts, the prisoner is penalized for actually

13

exercising that right." *Id.* (emphasis in original).

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Id.*

## A.  Protected conduct

"[I]nmates have a well-established constitutional right to access the courts."

*Thaddeus-X*,

175 F.3d at 391.  While "an inmate does not generally have an independent right

to help other prisoners with their legal claims," *Herron v. Harrison*, 203 F.3d 410,

415 (6th Cir. 2000); *Thaddeus-X*, 175 F.3d at 395 ("Rather, a 'jailhouse lawyer's'

right to assist another prisoner is wholly derivative of that prisoner's right of access

to the courts."), "[s]uch assistance is protected . . . when the inmate receiving the

assistance would otherwise be unable to pursue legal redress." *Herron*, 203 F.3d

at 415.  Thus, in this case, only if the plaintiff's assistance is necessary to

vindicate the mentally ill inmates' right to access the courts is the plaintiff engaged

in protected conduct. *Thaddeus-X*, 175 F.3d at 395.  The rights to file lawsuits

and to assist others in their legal claims are protected, however, only if the

underlying grievance or case itself is not frivolous. *Herron*, 203 F.3d at 415

(quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996) ("Depriving someone of a

frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of

14

Federal Rule of Civil Procedure 11 sanctions.")).

In his verified complaint, the plaintiff alleges that he engaged in protected conduct when he filed three lawsuits on his own behalf and when he assisted mentally ill inmates in the filing of two of those actions.  In their motion for summary judgment, the defendants argue that the plaintiff was not engaged in protected conduct because (1) he failed to demonstrate that without his assistance the mentally ill inmates could not have filed and pursued the lawsuits in question and (2) he failed to demonstrate that any legal action on his own behalf involved a non-frivolous claim.

### 1. *Mitchell et al. v. Seabold et al.*, United States District Court, Western District of Kentucky, Civil Action No. 3:02CV-P634-S

The first action which the plaintiff claims constitutes protected conduct is a federal § 1983 action, wherein the plaintiff and mentally ill inmates alleged that corrections officials "allowed prison conditions at KSR to fall below the bottom line of human exist[e]nce forbidden by the Eight[h] Amendment."  *See Mitchell et al. v. Seabold et al.*, 3:02CV-P634-S.  That action was ultimately dismissed in June 2003 on initial review for failure to comply with the exhaustion requirements.  Because of such failure, that lawsuit was clearly frivolous at its inception.[17]  The

---

[17]The court in *Mitchell v. Mugavin*, 3:03CV-469-R, discussed *infra* Section II.A.3, determined that the plaintiff was not engaged in protected conduct when he assisted other inmates in *Mitchell v. Seabold*, 3:02CV-634-S.  The plaintiff is consequently collaterally estopped from raising that identical claim raised in the instant action.  *See Hammer v. Immigration and Naturalization Serv.*, 195 F.3d 836, 840 (6th Cir. 1999) ("Under the doctrine of collateral estoppel, which is also referred to as issue preclusion, 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'") (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).

filing of that action did not constitute protected conduct.

## 2. *Froman et al. v. Taylor et al.*, Oldham Circuit Court, Division II, 03-CI-00650

The plaintiff additionally claims that he and other inmates whom he assisted filed *Froman et al. v. Taylor et al.*  He alleged in this state-court action against Corrections officials that he and mentally ill inmates at KSR were being denied access to courts, adequate medical needs, adequate safety, and adequate winter clothing.  That action was dismissed by the trial court, and only the plaintiff filed an appeal.  On February 11, 2005, the Kentucky Court of Appeals vacated the trial court's decision and remanded the matter for further proceedings.

In an attempt to prove that his assistance to the mentally ill inmates was required, the plaintiff relies on an October 15, 2003, order from Oldham Circuit Judge Rosenblum (DN 37, Ex. 9).  That order, however, merely provides that the plaintiff may assist the other inmates in the preparation of legal papers and in the prosecution of the action without fear of disciplinary action.  Judge Rosenblum specifically advises that he has no authority to appoint the plaintiff as a legal representative for other petitioners.  This order does not demonstrate that the plaintiff's assistance was necessary to the mentally ill inmates' presentation of their claims.  It only demonstrates that the plaintiff was permitted to assist them, as could any other inmate.  The plaintiff has additionally failed to demonstrate that the mentally ill inmates have no knowledge of the law, cannot read or write, or are unable to access the court in any meaningful manner without his help. *See*

16

*Thaddeus-X*, 175 F.3d at 395 ("Plaintiff Bell avers and the complaint suggests that Bell has no knowledge of the law and is unable to access the court in any meaningful way absent plaintiff X's assistance."). For these reasons, the court concludes that the plaintiff was not engaged in protected conduct when he assisted the mentally ill inmates in the Oldham Circuit Court action.[18]

Although the plaintiff's assisting mentally ill inmates in the state-court action was not protected conduct, the court concludes that the plaintiff's filing the action on his own behalf was protected conduct. In the state-court action, the plaintiff claimed that Corrections officials had shown deliberate indifference to his need for medical supplies. The trial court granted the defendants' motion to dismiss, but the Kentucky Court of Appeals concluded that "the trial court erred in dismissing Mitchell's action," vacated the dismissal, and remanded for further proceedings. Because the plaintiff's claim of deliberate indifference survived a motion to dismiss, the court concludes that it was not a frivolous action and that the plaintiff's filing and prosecution of that action constituted protected conduct.

### 3. *Mitchell v. Mugavin et al.*, United States District Court, Western District of Kentucky, Civil Action No. 3:03CV-469-R

On July 30, 2003, the plaintiff filed *Mitchell v. Mugavin*, a federal § 1983

---

[18]In *Mitchell v. Mugavin*, 3:03CV-469-R, discussed *infra* Section II.A.3, the court denied the plaintiff's Rule 59(e) and Rule 60(b) motions, concluding that the plaintiff had not presented any evidence that mentally ill, "special inmates" were denied access to court in *Froman v. Taylor*. Issue preclusion would also bar that claim's being raised in the instant action. Additionally, to his objections in *Mitchell v. Mugavin*, the plaintiff attached a docket sheet from his state-court action revealing that another inmate, Lawrence Froman, was also willing to assist the mentally ill inmates in that action. *See* Civil Action 3:03CV-469-R, DN 53, Attach. #1, Kentucky Court of Appeals docket sheet.

action.  On initial screening of the complaint pursuant to 28 U.S.C. § 1915A, the court dismissed all claims except a First Amendment retaliation claim against KSR officers Mugavin, Allen, Deweese, and Searcy.  Following discovery, the matter was referred to a magistrate judge, who recommended dismissal of the retaliation claim on the defendants' summary-judgment motion.  After considering the parties' objections, the court granted the defendants' motion and dismissed the action.  The plaintiff did not appeal.

The defendants contend that *Mitchell v. Mugavin* was frivolous.  They argue that although the plaintiff claimed that he had been a victim of retaliation because he was subjected to a "bogus" institutional disciplinary action, the court determined that some evidence supported the disciplinary charge, thereby precluding judgment for the plaintiff.  "As the suit had no possibility of success," claim the defendants, "it must be considered frivolous and, therefore, not protected."  The court disagrees.  Simply because the action was ultimately dismissed against the plaintiff on summary judgment does not mean that the action was frivolous.  *Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002) ("[T]he fact that the suit did not survive summary judgment did not render the act of filing it any less protected.").  The court thus concludes that the plaintiff's prosecution of *Mitchell v. Mugavin* constituted protected conduct.

Having concluded that the plaintiff was engaged in protected conduct in the Oldham Circuit Court case, *Froman et al. v. Taylor et al.*, and in the Western

18

District of Kentucky action, *Mitchell v. Mugavin et al.*, the court turns to the second element of a retaliation claim – whether an adverse action was taken.

### B.  Adverse Action

Not every adverse action against one who has engaged in protected conduct is constitutionally cognizable.  *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *Thaddeus-X*, 175 F.3d at 396.  "There is, of course a de minimis level of imposition with which the Constitution is not concerned."  *Ingraham*, 430 U.S. at 674.  The adverse action necessary to state a constitutional violation must be such that it would "'deter a person of ordinary firmness' from the exercise of the right at stake."  *Thaddeus-X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  This standard is an objective inquiry which is flexible enough to accommodate the various circumstances in which retaliation claims arise and which is capable of screening the most trivial of actions.  *Thaddeus-X*, 175 F.3d at 398.  "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact."  *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

The instant plaintiff claims that the defendants transferred him from his medically prescribed, single, wet cell at KSR's medical facility to a non-medical facility at which he was previously unable to handle his serious medical needs.  The defendants claim that the plaintiff's transfer was not an adverse act because it had no effect on his ability to access courts, GRCC was fully equipped to deal with his

19

medical needs, and there was no medical necessity for his placement in a single cell.

As to the defendants' claim that the transfer was not adverse because it had no effect on his ability to access the courts, the defendants rely on *Siggers-El v. Barlow*, 412 F.3d 693 (6th Cir. 2005), for the proposition that in order for a transfer to constitute an adverse action, it must be accompanied by "a number of foreseeable consequences" that would "inhibit [an inmate's] ability to access the courts." *Id.* at 702. The defendants overstate the holding in *Siggers-El*, which concluded that "[o]nly those consequences that inextricably follow from a defendant's alleged retaliatory conduct . . . would be considered in determining whether the plaintiff suffered an adverse action." *Id* at 702. The language quoted by the defendants in their motion for summary judgment, however, was the Sixth Circuit's analysis of the particular facts alleged by the plaintiff in *Siggers-El*. The entire quote is: "*In this case*, however, the transfer would deter a person of ordinary firmness from engaging in protected conduct, *since here*, the Defendant was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts." *Id.* at 702 (emphasis added). As a result of the transfer alleged in *Siggers-El*, the plaintiff "not only lost his high paying job that he needed in order to pay his attorney, but the transfer also made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Id.* "[T]he definition of adverse action is not static

20

across contexts." *Thaddeus-X*, 175 F.3d at 398.  Moreover, "the adverseness inquiry is an objective one, and does not depend upon how the particular plaintiff reacted," *Bell*, 308 F.3d at 606, and does not require that the plaintiff show actual deterrence.  *Id.*

The defendants further contend that GRCC was fully equipped to deal with the plaintiff's medical needs, that there was no medical necessity for his placement in a single cell, and that the transfer had no adverse effect on his health.  They rely on an affidavit from KDOC Medical Director Dr. Scott Haas, who on November 7, 2005, months after the plaintiff's transfer from KSR, averred, "It is my opinion that placement in a single cell is not a medical necessity for inmate Mitchell."  The plaintiff, however, provides a copy of Physician's Orders dated December 6, 2001, wherein a Dr. Khayat wrote, "single room door / need to cath himself frequently." (DN 1, Attach. #7).  He also attaches a copy of a July 7, 2002, prescription written by a urologist, Dr. Jackson, who ordered that the plaintiff be placed in a wet cell equipped with a commode.  *Id.* at Attach. 13.

Regardless of whether a single, wet cell is medically necessary, it is clearly preferable in the plaintiff's situation, and the defendants concede as much in their motion for summary judgment.  *See* DN 33 ("While total privacy is certainly desirable in theory for an individual who must self catheterize. . . .").  The plaintiff reports that after being transferred to GRCC he was stabbed, humiliated, and threatened by inmates due to his being forced to catheter himself in front of other

21

inmates and to carry a red bag for infectious diseases to the medical department on a daily basis.  "[W]hile certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only *inconsequential actions,* and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment."  *Thaddeus-X*, 175 F.3d at 398 (emphasis added); *Bell*, 308 F.3d at 603 ("[I]n most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law.").

A reasonable trier of fact could conclude that the plaintiff's transfer from a single, private, wet-cell setting to a dissimilar setting is more than an inconsequential act.  *See Bushway v. Bureau of Prisons*, No. 97-5282, 1999 WL 1021584, at *3 (6th Cir. Nov. 2, 1999) (indicating that "defendants may have taken adverse actions against him when they transferred him pursuant to a general transfer instead of medical transfer, as the conduct complained of would likely have had a strong deterrent effect").  "[I]f a reasonable trier of fact could conclude that a retaliatory act would deter a person from exercising his rights, then the act may not be dismissed at the summary judgment stage."  *Siggers-El*, 412 at 701.

The plaintiff has adduced proof sufficient to support such a conclusion.  Thus, the plaintiff has established facts which a trier of fact could conclude establish adverse action.

### C.  Causal Connection

"Finally, the third element – a causal connection between the protected conduct and the adverse action – needs to be established by the plaintiffs to complete their affirmative case." *Thaddeus-X*, 175 F.3d at 399.  "Here the subjective motivation of the defendants is at issue." *Id.* "If the prisoner is able to prove that his exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct, the burden shifts to the defendant to show that the same action would have been taken even absent the protected conduct." *Brown v. Crowley*, 312 F.3d 782, 787 (6th Cir. 2002) (citing *Thaddeus-X*, 175 F.3d at 399).

The defendants argue that the plaintiff has not shown a causal connection because they were not parties to any of the federal or state court actions.  It is not a requirement, however, that the defendants themselves be parties to the protected conduct in question.  They further argue that the plaintiff has proffered no evidence demonstrating that any defendant directly threatened him or had knowledge of the pending state and federal court actions or that defendants Smith and Bell did anything more than act upon a directive.

"Admittedly," observes the Sixth Circuit, "retaliation 'rarely can be supported with direct evidence of intent.'" *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir.1987)).  Rather, a plaintiff can "establish retaliatory motive by alleging a chronology of events from

23

which a retaliatory animus on the part of the defendants could reasonably be inferred." *Manning v. Bolden*, 25 Fed. Appx. 269, 271 (6th Cir. Dec. 7, 2001) (citing *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988)); *Thaddeus-X*, 175 F.3d at 399 ("Circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate."). And "[r]eliance on a superior's orders does not in itself dissipate all liability." *Thaddeus-X*, 175 F.3d at 393.

Here, the plaintiff has established that GRCC officials recommended a medical transfer to KSR in November 2001 because of his need to self-catheterize several times a day; that a physician prescribed a single room with a door because of the plaintiff's need to self-catheter; that in March 2002 and in May 2003 KSR officials, including defendant Bell in March 2002, recommended that the plaintiff be transferred away from KSR and that both transfers were stopped because of the plaintiff's medical/cathetering situation; that in 2003 the plaintiff filed federal action 3:03CV-P469-R alleging retaliation against KRS officials, including Mugavin, and filed state action 03-CI-00650 against KDOC and KSR officials raising various claims including inadequate medical treatment; that during a November 7, 2003, encounter with the plaintiff, Mugavin threatened to use all of his power as a warden to stop the plaintiff from filing legal papers; and that the plaintiff sent former Warden Seabold a letter on November 9, 2003, advising of Mugavin's allegedly threatening and intimidating tactics.

24

The plaintiff has further shown that upon Chandler's arrival at KSR as the new warden, the plaintiff informed Chandler by letter of his legal problems concerning retaliation and threats by Mugavin and that Warden Chandler responded on December 3, 2003, advising that he had reviewed the plaintiff's file and found his allegations against Mugavin without merit and had reviewed an order by Judge Rosenblum.  Based on Warden Chandler's statement that he had reviewed the plaintiff's "file," a reasonable jury could find that he was aware of the plaintiff's medical history, his need for self-catheterization, his litigation history, and his conflict with Mugavin.  Additionally, by Warden Chandler's statement that he reviewed the judge's order, it is clear that he knew about at least the pending state-court action.

The plaintiff continues to demonstrate that on December 11, 2003, defendant Smith informed the plaintiff that Chandler had given him instructions to transfer the plaintiff away from KSR because Chandler was not going to allow the plaintiff to stay at KSR while he was warden;[19] that on that same date, the plaintiff wrote Chandler a letter accusing him of transferring him because of his legal activities against Mugavin and asking him why he was transferring him to GRCC, when two years earlier, GRCC officials had transferred the plaintiff to KSR due to his need to catheter himself; that defendants Smith and Bell recommended the transfer to GRCC on December 16, 2003, to afford access to available bedspace

---

[19]In his affidavit, Chandler admits that he directed that transfer of the plaintiff be considered at the plaintiff's regularly scheduled classification hearing (DN 33, Ex. 2).

and since the plaintiff was not in any programs offered at KSR; and that when questioned as to why they transferred the plaintiff, Smith told him that it was based upon instructions, though Smith agreed that it was wrong and that the plaintiff should not be transferred from the medical facility.

The plaintiff further demonstrates that Deputy Warden Mugavin, with whom the plaintiff had the known conflict, answered the appeal and approved the transfer, apparently as the warden's designee.[20]  Thus, Warden Chandler apparently allowed Mugavin not only to address the plaintiff's appeal but also to actually approve the transfer.[21]  It is true that a classification branch manager also approved the transfer, *id.*, and a nurse concluded that the plaintiff was in "fair health" and thus "qualified for transfer," (DN 1, Attach. #30).  The defendants, however, by directing and recommending the transfer, set the transfer into motion.  *See Siggers-El*, 412 F.3d at 701 ("[T]he Defendant filled out the screen knowing the effect it would have–that it would lead inexorably to the plaintiff's transfer, which is exactly what occurred.").

The plaintiff "put forward a number of specific, nonconclusory allegations

---

[20]Kentucky Corrections Policy and Procedure 18.1 governs the classification of an inmate and directs, "An inmate may appeal any classification action to the *Warden or his designee* within five (5) working days of the action." *See* CPP 18.1(VI)(L)(1) (emphasis added).  On both the appeal form and the transfer authorization form, Mugavin signed his name on the line designated for the warden/designee. This suggests, and a reasonable juror could conclude, that Warden Chandler gave Mugavin, who had threatened to stop the plaintiff's litigation activities and to transfer him, the power to carry out his threats.

[21]As noted earlier, prior to the plaintiff's lawsuits and complaints against Mugavin, Mugavin had previously advised staff to maintain the plaintiff at KSR in light of the plaintiff's circumstances.

and identified affirmative evidence that could support a jury verdict at trial."
*Thaddeus-X*, 175 F.3d 399-400.

He has thus met his burden of demonstrating that his litigation activity against Mugavin was a motivating factor in the defendants' decision to transfer him.

The defendants argue that they would have taken the same action in the absence of the protected activity. The defendants report that the plaintiff and his girlfriend "deluged" KSR and the Department of Corrections with continuous, baseless accusations and threats against Mugavin. The plaintiff's conflict with Mugavin, contend the defendants, escalated to the degree that the plaintiff actually harmed himself in efforts to avenge himself on Mugavin for imagined wrongs.[22] The defendants further claim that Chandler's decision to transfer the plaintiff was based upon the need to maintain security and safety for inmates and staff at KSR and to relieve staff, particularly Deputy Warden Mugavin, from the strain of constantly dealing with the plaintiff's accusations, threats and irrational behavior.[23]

---

[22]As noted earlier in this opinion, the plaintiff maintains that he was stabbed by an inmate, that results of lie-detector tests proved his truthfulness, and that a psychologist suggested that the wounds were not self-inflicted.

[23]By affidavit, Chandler reported that he recommended the plaintiff's transfer from KSR, but "not for purposes of retaliation against him for filing lawsuits, but due to the continuous harassment in which he and his girlfriend were engaging outside the scope of litigation. Mitchell's escalating and unsubstantiated accusations against Deputy Warden Mugavin made it infeasible for Mitchell to remain at KSR. This was particularly true in light of the fact that it appeared that Mitchell had harmed himself in his efforts to cause problems for Deputy Warden Mugavin." (DN 33, Ex. 2). Chandler further averred that he, Mugavin, and staff at the KDOC were frequently in receipt of letters and memoranda from the plaintiff and his girlfriend. "In addition to the allocation of time, being the constant target of harassment, threats, and false accusations by an inmate is disruptive and detrimental to staff morale and staff/inmate relations."

In *Ward v. Dyke*, 58 F.3d 271 (6th Cir. 1995), the plaintiff "was filing approximately five grievances or appeals (67 grievances and 48 appeals in five months) per week." *Id.* at 274.  The defendants in that case argued that the sheer volume of the plaintiff's complaints interfered with prison administration and caused tension among staff." *Id.*  The Sixth Circuit concluded that it is constitutionally permissible for prison officials to transfer a prisoner "to give prison staff a respite from his continuous barrage of grievances." *Id.*  In the instant case, however, the defendants have not demonstrated such a "barrage."  In fact, the defendants have submitted only a few letters written by the plaintiff and his girlfriend.

At the point where the plaintiff suffered harm, either by his own hand or that of another, the court can certainly see the need for some action.  *See Brown v. Johnson*, 743 F.2d 408, 410 (6th Cir. 1984) ("'[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights' of convicted prisoners.") (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)).  And "[p]rison officials should be accorded substantial deference in the adoption and implementation of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Brown*, 743 F.2d at 410 (citations and internal quotation marks omitted).  "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence

of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should not ordinarily defer to their expert judgment in such matters." *Id.*

Given the facts of this case, however, a reasonable jury could question whether the plaintiff's transfer away from a single, wet cell environment to GRCC was for a legitimate, non-punitive reason. The court declines to find, as a matter of law, that the defendants would have made the transfer decision even in the absence of the plaintiff's protected conduct. This is for a jury to decide.

### IV.  ORDER

As discussed above, genuine issues of material fact exist on the plaintiff's claim. Accordingly, **IT IS ORDERED** that the defendants' motion for summary judgment (DN 33) is **DENIED**.

The Clerk shall serve a copy of this memorandum opinion and order on the plaintiff and counsel of record for defendants.

Signed on  September 27, 2006

Jennifer B. Coffman
**Jennifer B. Coffman, Judge**
**United States District Court**

29